[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review the File
This matter first came to the court by virtue of summons and complaint, which complaint was dated March 1, 2000 and returnable April CT Page 2151 4, 2000, in which complaint the plaintiff petitioner sought a dissolution of the marriage, alimony, an allowance to prosecute, a property settlement in accordance with § 46b-81 of the Connecticut General Statutes (C.G.S.) and that her maiden name Salim be restored.
Accompanying the complaint was a motion for alimony and an allowance to prosecute pendente lite dated March 1, 2000 and, in addition, a motion for exclusive use of family home pendente lite dated March 1, 2000. The usual set of automatic orders accompanied the complaint and the return of the sheriff.
On April 3, 2000 the defendant appeared by counsel.
A careful examination of the file reflects that none of the filed motions were acted upon.
In due course on January 24, 2001 the plaintiff and the defendant with their respective attorneys and witnesses appeared before the court and the matter was heard to a conclusion.
The court makes the following findings of fact:
The plaintiff wife's maiden name at the time of her marriage was Salim. The plaintiff and the defendant were joined in marriage in the country of Romania, city of Constanta, on June 28, 1972.
The court notes that according to the testimony of the defendant, which will be touched on in due course, that he identified the date of the marriage as June 28, 1973.
No copy of the marriage certificate or other governmental paper was presented to the court to verify the exact date.
The plaintiff and the defendant have resided in Connecticut for more than one year next preceding the filing of the complaint.
The marriage of the parties has in fact irretrievably broken down with no reasonable prospect for reconciliation.
At the time that the complaint was filed there was one minor child issue of this marriage whose name is Menderez Ali born May 7, 1982. This young man had attained age 18 prior to the date of the trial.
No other minor children have been born to the plaintiff petitioner wife since the date of the marriage. CT Page 2152
The State of Connecticut is involved in this proceeding although no representative of the Attorney General's Office Welfare appeared and the plaintiff petitioner is presently receiving state-administered general assistance.
The plaintiff and the defendant after their marriage resided in the country of Romania for approximately ten years and left that country because of their concerns as to it being, in their words, a communist country and they wished to leave Romania to better both themselves and their children.
There was another child issue of this marriage, a young man by the name of Atila Ali, who at the time of the filing of the complaint was not a minor.
The youngest child Menderez was eight months old when the parties left Romania.
There were during the proceedings some instances where language may have been a slight problem but by and large there were no major impediments to the testimony of the parties.
The plaintiff and the defendant on leaving Romania first went to Turkey and there remained for a number of months in order that the necessary paperwork might be processed which would enable them to come to the United States.
The plaintiff testified even at the time that the parties resided in Romania that there were problems in the marriage and that there were no social agencies available in that country to assist in trying to resolve or assist with regard to the domestic problems that existed.
The plaintiff's testimony was to the effect that she suffered beatings by the defendant on her person while living in Romania; that the plaintiff was prohibited from speaking and expressing herself by virtue of the admonitions of the defendant. The plaintiff testified that she was frequently the object of physical violence inflicted on her by the defendant and sustained bruises and contusions on her back and her legs. The plaintiff's testimony was to the effect that the defendant had a bad temper and that the plaintiff was unable to reason with the defendant.
According to the plaintiff's testimony the defendant was arrested in 1994 in this country as a result of striking her about the body or the face with a 2 x 4. No arrest record was presented to the court. CT Page 2153
While residing in Romania the plaintiff and the defendant worked together for some governmental entity. As noted, in leaving Romania the parties went to Turkey and remained there for some time before they were eligible to come to the United States. When the plaintiff and the defendant first came to the United States, they came to New York State. Subsequently the parties moved to Dallas, Texas. At the time of the parties coming to the United States, the plaintiff was age 24 and the defendant was age 29. The plaintiff cared for the children that were then minors and the plaintiff was not employed during the sojourn of the parties in Texas. The plaintiff has pretty much been a homemaker all of her adult life. The plaintiff testified that she has never had a motor vehicle nor held a driver's license. This at least attributable in part to language or writing barriers.
The plaintiff testified that the defendant would not let her go shopping by herself and that the plaintiff was prevented from having friends and that the defendant was extremely possessive.
The parties resided in Texas for a period of about seven or eight years and the defendant was employed there in maintenance work for various employers. The plaintiff testified that she has never seen any paycheck or other evidence of the defendant's earnings during the life of the marriage.
It was the plaintiff's testimony that the defendant's mother handled all of the funds. The defendant's mother apparently resided with the parties or in close proximity to them during a substantial portion of their residency in this country.
At one point the plaintiff testified she was required to secure a restraining order against the defendant.
The plaintiff receives assistance in welfare from the State of Connecticut. That matter will be touched on in greater detail in a later portion of the memorandum.
The plaintiff testified that the defendant at one point in time received social security benefits as concerns medical or physical welfare problems.
During the period 1996-1998 while residing in Connecticut the defendant traveled to Europe, to Romania or other locations four or five times.
After the parties left Texas, before settling in Connecticut, they CT Page 2154 first came to Rhode Island and the defendant had visited various New England states before the parties settled in Connecticut looking for a residence that would be suitable to their needs and purposes.
In due course the parties found a residence and property at 26 Lincoln Avenue in Pawcatuck. The property apparently had been damaged by fire or water and required extensive repairs before the same was livable.
After the acquisition of this property the parties rented a residence while the aforementioned Lincoln Avenue property was being restored. The defendant apparently during this time frame was receiving disability payments as concerns a prior injury. The testimony was to the effect that the parties paid $30,000.00 in cash for the aforementioned residence.
The plaintiff in her testimony pointed out the outline of a scar over her left eye which she testified was the result of being struck with a wooden object by the defendant. The authorities were called on that occasion, which caused considerable upset, not only between the parties but the then minor children. The defendant according to the plaintiff's testimony told her that if she was to summon the authorities that he would kill her.
The plaintiff's testimony was to the effect that after coming to Connecticut that the defendant continued in his abusive conduct to her and the plaintiff verified that the defendant was the recipient of social security disability payments.
According to the plaintiff after the parties were living in Connecticut, the defendant would periodically send money abroad to his parents in Romania for their health and subsistence.
According to the plaintiff the defendant never assisted or helped her with regard to many of the household duties, that the defendant spoke frequently by phone with his family abroad but prohibited the plaintiff from doing the same. The plaintiff indicated that ethnic considerations prevailing either in Romania or Turkey were to the effect that the wife was to be subservient. The plaintiff testified that she never went out socially and had no friends and was prohibited from doing that by the action of the defendant. The plaintiff's testimony was to the effect that the defendant frequently went to New York City with friends of his.
In February of 1998 the defendant returned from a visit to Romania and for some period of time thereafter conditions appeared to improve. The oldest son of the parties, Atila Ali, apparently on one or more occasions made available to the plaintiff and the defendant monies from a CT Page 2155 settlement he had received as concerns certain relatively serious injuries by virtue of coming in contact with a high-tension power line.
The plaintiff's testimony was to the effect that on a variety of occasions that the defendant would continue to threaten her and threaten to do away with her.
The testimony was to the effect that on occasion in times past that the children witnessed the physical beating's which the plaintiff sustained.
The plaintiff's testimony was to the effect that during the entire life of the marriage that she has felt in her words that she was in prison.
By way of illustration the plaintiff testified as to an incident involving a comb and a holder in the bathroom, that the comb was in its regular accustomed place for her benefit, that the defendant on an occasion threw it out, the plaintiff replaced it, arguments ensued and the plaintiff testified that the defendant's response was to the effect by virtue of his being upset as concerns the object that he would do away with her.
The plaintiff testified that she is treated for high blood pressure by a physician and that she has explained or made known to her physician the corporal problems that have been inflicted upon her.
The plaintiff's testimony was that she is in continual pain from neck and back problems.
After the parties had been in Connecticut for some time the plaintiff's mother-in-law returned to Romania in 1989.
In 1996 the defendant traveled to Romania. The same apparently being made possible by his securing a certain sum from the oldest child Atila, which funds were a portion of a settlement that the young man had received as concerns injuries by virtue of his coming in contact with a high-tension line.
The oldest child Atila, as a result of that injury, apparently sustained memory loss and other problems which required considerable rehabilitative efforts in order for him to have arrived at the present state of his well being.
The plaintiff's testimony was to the effect that the defendant turned the youngest son Menderez against her by virtue of his words and comments. CT Page 2156
The youngest child Menderez accompanied the defendant to Romania in the 1996 trip in July. The defendant and the young man Menderez were there for seven or eight months prior to returning. This caused the plaintiff concern because the young man was being kept out of school.
The plaintiff's testimony was to the effect that while the defendant and the youngest son were abroad that the defendant neither called nor wrote to her nor did the defendant send her any money or remittances.
Apparently on the occasion of the 1996 visit to Romania, the defendant secured the sum of $20,000.00 from the settlement proceeds involving the oldest son and took on that trip to Romania $15,000.00 in traveler's checks and $5,000.00 in cash. Upon his return he represented that the funds were gone.
In 1997 the plaintiff and the defendant returned together to Romania for the purpose of seeing her parents. At that time the defendant requested that the plaintiff secure from the eldest son Atila the sum of $10,000.00 in order that she, the plaintiff, might accompany the defendant.
The son Atila gave from his funds the sum of $5,000.00 being reluctant to provide as much as $10,000.00. Of that sum, according to the testimony, the defendant spent $2,000.00 on a video camera and insisted that the plaintiff turn over the remaining $3,000.00 and, according to the testimony, the defendant spent it all.
At one point in time, which was not clearly identified, the plaintiff was injured in an automobile accident. The defendant, according to the testimony, was the driver. The plaintiff sustained neck and back injuries. The matter went to trial and according to the testimony the plaintiff was awarded $49,000.00.
Certain fees and charges, including attorney's fees, were paid from said sum including obligations of the defendant and an obligation to the State of Connecticut for a certain lien that was chargeable to the defendant and the plaintiff ended up with only $11,000.00 from said sum. In due course, the defendant demanded the $11,000.00 from the plaintiff.
With regard to the 26 Lincoln Avenue, Pawcatuck property, when finished, it was represented, that this would be a two-family home but the same has never been completed.
The plaintiff presently receives the sum of $350.00 monthly from the CT Page 2157 State of Connecticut.
The oldest son Atila is now age 27. This son helps the plaintiff financially.
Since the imposition of the restraining order first implemented in this matter, the defendant has given nothing to the plaintiff.
The plaintiff's request of the court was to the effect that she was desirous of having the court enter an order granting and allowing her to have the entire equity in the property at 26 Lincoln Avenue, Pawcatuck.
According to the testimony the son Atila was born in Romania in 1974 and was eight years old when the parties came to the United States.
The plaintiff testified that she was one of eleven siblings, most of whom reside in Romania.
The plaintiff testified that when the parties were living in Texas that the plaintiff's mother-in-law resided with them and that the plaintiff took good and loving care of her mother-in-law.
The plaintiff also testified that she has never learned to drive an automobile nor hold a motor vehicle license.
During the sojourn in Texas, the plaintiff's testimony was to the effect that the plaintiff was prevented from seeking any outside position of employment.
In 1989 certain relatives of the plaintiff visited her in Connecticut.
The plaintiff was desirous of trying to seek work and employment but was prevented from doing so by the defendant.
It is the plaintiff's claim that the defendant has turned the youngest son Menderez against her and on the basis of the testimony during these proceedings, both of the sons, Atila and Menderez, that would seem to have merit.
The plaintiff testified that as a caring parent she endeavored to prevent the son Menderez from smoking and using alcohol but that the defendant overruled her and allowed it.
The plaintiff was concerned with regard to the children going to school and indicated that the defendant was not concerned in that respect. CT Page 2158
The plaintiff testified that the defendant had a secret mailbox where he received letters allegedly from female acquaintances, either in Romania or here in this, country.
The testimony was to the effect that the defendant would on occasion make remittances to the female friends as a result of the communications back and forth from his "secret mailbox".
Incident to the 1998 altercation where the authorities were called, the defendant was arrested as was, unfortunately, the youngest child Menderez. The plaintiff claiming that the youngest son contributed to an assault on her.
The plaintiff testified that she has hearing problems.
The plaintiff testified that the youngest son Menderez had falsely accused her of initiating an assault on him with a knife.
At one point apparently during 1998 the plaintiff was arrested on the basis of a claim by the youngest son Menderez who represented that he had been assaulted and his nose broken or a nosebleed caused. The plaintiff's testimony was to the effect that this conduct by the youngest son was false and faked and was unjustified. No verification of this arrest was presented to the court.
The plaintiff's testimony was to the effect that she is, in her words, sick and cannot work.
In 1999 the plaintiff applied for social security and was allegedly denied. No exhibit or document with regard to that application was presented to the court.
The plaintiff's testimony was to the effect that while she is fairly conversant in the English language that she cannot read English.
The plaintiff testified that she experiences dizzy spells.
The plaintiff on inquiry by the court verified that her maiden name was Salim; that she is age 45; verified that she receives $350.00 monthly from the State and $100.00 monthly for food stamps.
From the date of the initiation of the complaint to the present time, the plaintiff has received nothing else from the defendant by way of support or assistance. Any other help or assistance apparently to the CT Page 2159 plaintiff has come from the son Atila.
The son of the parties, Atila, is now age 27 and the son Menderez is 18.
The plaintiff's education in Romania extended through the tenth grade.
The plaintiff at the time of her marriage, as her memory served her, was either 15 or 16 and apparently the consent or blessing of her parents was never secured before the marriage.
The plaintiff testified that the title to the property at 26 Lincoln Avenue, Pawcatuck is in both names and that the same is free of any mortgage or lien, verified that the house was purchased with $30,000.00 in cash and that when first acquired the house was not habitable.
The plaintiff testified she has no money in the bank, owns no stocks or bonds. Her only asset is her equity in the aforementioned home. She has received assistance from the State of Connecticut since 1999 and, as noted, any additional help or assistance comes from the oldest son Atila who provides her with transportation and buys her food and assists in paying her bills.
The son Atila, who is a single person, now resides with the plaintiff.
The plaintiff requested that the court grant the petition of dissolution and grant her the entire equity in the house.
The plaintiff's testimony with regard to alimony was that she would wish to receive alimony but in her words felt that the defendant would never pay it.
The plaintiff testified that the entire contents of the Lincoln Avenue residence had been provided by the son Atila, that Atila pays the taxes on the property and all other uncovered expenses for her, that Atila some time ago as a result of an accident involving electricity had received a settlement in the amount of $300,000.00, less attorney's fees and other costs and expenses, and that it is from these funds that the oldest son has helped and assisted her.
The plaintiff testified that unfortunately contacts between herself and the youngest child are infrequent and unhappy.
From the testimony of the oldest son Atila Ali, the court finds that in fact he does presently reside with the plaintiff He testified that his age was 26; that he has been assisting his parent mother for some time; CT Page 2160 that his education extended through two years in college at the University of Connecticut.
This witness testified that he observed verbal and physical abuse of his parent mother by the defendant and characterized her existence as being a slave. The son testified that the plaintiff was frequently beaten by the defendant and that he observed her having sustained black eyes and swollen lips.
The son Atila is presently a dealer at Foxwoods.
He verified that he had been injured in the past and sustained an electrical shock by virtue of coming in contact with a high tension line while a minor. He verified that he had lost, for a time, short and long-term memory and had received three years of therapy after the incident, that the legal claim on his behalf was settled when he was age 18 and that he turned over some of the funds that he received to the defendant.
This witness testified that on an occasion the defendant asked of him the sum of $20,000.00 so that he could go to Romania and there permanently remain. The witness' testimony was to the effect that he provided said sum from his monies to the defendant but that the defendant did later return and asked for further monies from the son Atila Ali.
This witness testified that he has endeavored to help his younger brother Menderez and the defendant to secure positions at Foxwoods.
This witness verified that the settlement figure for the injuries he had sustained were in fact $300,000.00 less attorney's fees and other costs and expenses.
This witness Atila Ali testified that in 1994 he called the police and authorities as a result of abuse by the defendant on the person of the plaintiff.
This witness testified as to a certain occasion where he was listening to certain music on a tape, that the defendant became annoyed and angry, that the defendant destroyed the tape even though the witness indicated that it had been borrowed from a friend.
From the testimony of the defendant the court finds according to his testimony the parties were joined in marriage in Romania in 1973; that the parties lived in a government apartment in Romania when they were first married; that in 1983 the parties went to Istanbul in Turkey; that CT Page 2161 before leaving Romania that the defendant had operated a factory in Romania that made plastic hoses; that the plaintiff and the defendant worked together in this venture in Romania.
The defendant's testimony was to the effect that the climate in Romania was to the effect that he was being pressured to join the Communist party, he was not inclined to do so and therefore left and the parties traveled to Istanbul in Turkey where they lived in a "camp" for 11 months.
It was the defendant's testimony that there were no marital problems between the parties while they resided in Romania and contrary to the plaintiff's representations or claims, the defendant claimed that the plaintiff had slapped him.
The defendant's testimony was to the effect that his earnings went to the plaintiff and that the plaintiff was supposed to look after financial matters and pay the bills.
The defendant verified that when the parties came to the United States that the defendant's mother came with them and it was the defendant's claim that his mother had raised up the boys and not the plaintiff.
The defendant verified the residency in Texas in the Town of Bedford. The defendant's activities there were in maintenance and janitorial work through 1989.
The defendant acknowledged that he sent various sums to his parent father in Romania.
While in Texas the defendant sustained an injury with regard to the framework of a large trampoline falling on him, this in 1989, and as a result thereof, there were two surgical procedures required on his back and spine and he received worker's compensation. His testimony was to the effect that he received the sum of $40,000.00 incident to that problem.
The defendant acknowledged that there were verbal fights or altercations between the parties. It was the defendant's testimony that the plaintiff in fact did have friends while they resided in Texas, people from the country of Afghanistan. The plaintiff and the defendant by virtue of the processes that they have gone through are now both citizens of this country.
The defendant characterized physical problems between the parties as consisting mostly of pushing. CT Page 2162
The defendant verified the price being paid for the Lincoln Avenue property in Pawcatuck being $33,000.00 and that the price was paid in cash.
It was the defendant's testimony that these monies came from certain funds that had secured or been entitled to as a result of teaching retirement funds, presumably accrued in Romania.
The defendant's testimony was to the effect that the rebuilding of this damaged residence was done entirely by himself, a wide variety of problems of carpentry, plumbing, electrical work and matters of like nature.
The oldest son Atila initially was in a high school in Westerly, Rhode Island, subsequently transferred to a high school in Stonington.
The defendant acknowledged that the second floor of the Lincoln Avenue property is not yet finished and is not yet habitable.
The defendant testified that he was concerned that the son Atila had not used his settlement monies wisely; that he had purchased a number of motor vehicles. This course of conduct was considered to be inappropriate by the defendant who felt that the monies should be used for the purpose of the son Atila and himself going into business.
The altercation occurring with regard to the tape that the defendant destroyed under his foot occurred in 1996 according to his testimony. The defendant testified that the content of the tape was violent and profane and it offended him.
The defendant described the injury that the oldest son Atila had sustained the same involving an aluminum ladder being placed in such a fashion that it came in contact with a high tension line.
The defendant denied that he had promised to return to Romania and remain there when given the $20,000.00.
The defendant acknowledged making three or four trips to Romania over the last few years. The first two trips were undertaken by the defendant alone. The third time the plaintiff and the defendant went together with the sons. The defendant testified that as concerns injuries he had earlier sustained that he went through a process of rehabilitation in Hungary that extended over a period of eight months. The defendant testified he has been employed at Foxwoods since the year 2000. CT Page 2163
The defendant testified that after leaving the Lincoln Avenue residence that he was obliged to live in his car for the months of February, March and April 2000 on premises at or near Foxwoods Casino.
The testimony was to the effect that in May of the year 2000 the defendant and the youngest son Menderez secured an apartment for which the monthly rent is $565.00.
The defendant's position is to the effect that the plaintiff is capable of working.
The defendant testified that he earns $7.80 an hour, that his gross is $312.00 and his weekly net is $231.00.
The defendant put a value on the Lincoln Avenue property on his financial affidavit but at the time of his testimony indicated that he felt that the residence was worth, in his words, over $200,000.00, which is at marked variance with what he showed on the financial affidavit, which was $140,000.00.
The defendant represents that he wants his equity share of the premises.
The defendant feels that the home was initially acquired by virtue of the settlement funds that he received as concerns the injury in Texas, this in contrast to earlier testimony.
The defendant's testimony was to the effect that he was displeased with his son Atila and felt that he had, in his words, squandered some of his settlement monies on motor vehicles and two boats.
The defendant acknowledged that his only asset is his equity in the home.
The defendant allowed that the plaintiff might keep or retain the entire contents of the home. The defendant hopes in the future to acquire another residence and to live there with the youngest son.
The defendant testified that on one or more of his visits to Romania that he purchased four gold bracelets which he gave to the plaintiff.
The testimony was to the effect that he owns a Mercedes automobile in Romania. There were no particulars given with regard to the age or status of the vehicle.
The defendant acknowledged writing letters to a lady by the name of CT Page 2164 Simona in Romania and that this was for the purpose of assisting a 14-year old child where he sent. according to his testimony, the sum of $25.00 as a gift.
It is the defendant's position that he cannot now work although manifestly he is presently employed at Foxwoods.
While the parties were in Texas the testimony was to the effect that his mother did call the authorities because of a conflict between the plaintiff and the defendant and that his mother moved to another unit in the structure in which the parties were then residing.
The defendant's age is 51 presently.
He verified that he receives $7.80 an hour at Foxwoods; indicated that he is not presently treating with any physician; that his education extended through high school; that both he and the plaintiff are United States citizens; that he has now lost certain formally secured Social Security benefits. He attributed this to the plaintiff's failure to cooperate with Social Security.
From the testimony of the son Menderez Ali, age 18, this witness verified that he resides with the defendant and his girlfriend. This meaning the girlfriend of Menderez Ali.
This witness disputed that his parent mother had been the object of physical violence while the parties were in Texas. He acknowledged that there were frequent arguments between the plaintiff and the defendant.
The son Menderez testified that he tried to be a peacemaker between the parties and that this created conflict for himself and his brother Atila.
This witness testified that the only violence that he observed were matters of pushing and loud arguments and represented that he saw no blows struck.
This witness' testimony was to the effect that on occasion the plaintiff would strike him.
At one point in time apparently the parties had a small dog, a Bichon Frisse, and the claim by the defendant was to the effect that the plaintiff would strike and hit the dog. Neither son offered any testimony with regard to that claim.
From the health form the court observes that allegedly this is the CT Page 2165 first marriage for the defendant and the second for the wife; however, clearly this cannot be and is erroneous. The plaintiff being married at age 15 or 16 without parental consent and the parties remaining joined in wedlock to the present time.
From the financial affidavit of the plaintiff, the court notes that she characterizes her occupation as a homemaker, that on a weekly basis she receives $81.40 public assistance from the State of Connecticut and $27.91 on a weekly basis in food stamps. Her total weekly income is $109.31. Her expenses are shown as amounting to $291.60. Presumably the shortfall is being made up by assistance from the oldest child Atila Ali.
The plaintiff shows no debts and the only asset being her interest in property known as 26 Lincoln Avenue, Pawcatuck, which she values at $92,000.00, no mortgage, her equity share being $46,000.00. She has no motor vehicle, no value shown for personal property. She has no bank account, no stocks, bonds, mutual funds or matters of like nature, no insurance, no pension plan and no other assets of any sort or description. The total cash value of her assets then appear to be her one-half share of the equity amounting to $46,000.00.
From the defendant's financial affidavit it reflects that he is employed at Foxwoods; that his weekly gross is $312.00; weekly net, $231.00, although the affidavit does not reflect the itemized deductions. His weekly expenses are reflected as being $256.00. The defendant values the property at 26 Lincoln Avenue, Pawcatuck at $140,000.00, no mortgage. He values a 1991 Ford automobile at $500.00 free and clear, a 1996 Mercury at $1,200.00 with an equity in the same amount.
The defendant shows no other assets of any kind, no money in the bank, no stocks, bonds, mutual shares, insurance or pension plan.
During the conduct of the proceedings the court was presented with a letter from the State of Connecticut, the Office of the Attorney General. The letter was addressed to the attorney for the plaintiff petitioner.
The letter indicated that the plaintiff is currently the recipient of state assistance pursuant to the programs Title XIX, medical assistance, SHEA cash-administered general assistance in the amount of $350.00 a month. As of the end of November 2000, the sum of $8,129.00 in SHEA cash has been provided to the plaintiff. Although a representative with the Attorney General's office did not appear before the court, the claim in CT Page 2166 the aforementioned letter dated January 5, 2001 was to the effect that the State's request was for an order of $1.00 a year alimony, modifiable by only the State.
No other documents or exhibits were presented to the court.
There was no written real estate appraisal provided by either party.
There was no expert witness or realtor who appeared to express an opinion as to value.
There were no income tax returns presented.
There was no certificate of title with regard to the status of the aforementioned real estate.
The court, of course, is mindful of the fact that some of these items would have required the expenditure of funds, which apparently neither of the parties have. The court touches on this merely to indicate some of the problems with which it is beset.
 Discussion
This is a marriage of 28-1/2 years.
There are two children issue of this marriage but both are now mature adults.
As noted in the memorandum, the State of Connecticut has an interest in these proceedings but were not represented by counsel.
Because of the ethnic background of the parties, there were a few minor problems with regard to the testimony being in English but nothing of any great consequence.
The court is inclined to the view that the testimony of the plaintiff is credible and that the same is supported by the testimony of the oldest son Atila Ali.
It would appear that the plaintiff has been subjected to physical violence during the life of the marriage. The plaintiff has been primarily all of her life a parent and a homemaker.
The plaintiff has no skills that could be offered in the workplace and her prospects in that respect therefore are limited. CT Page 2167
There is little question but what ethnic differences may have contributed to some of the marital problems; that is to the extent of what might be acceptable in the foreign jurisdiction and contrast to Connecticut.
Although no medical testimony was offered, the plaintiff apparently suffers from high blood pressure and treats on occasion with a physician.
The court is persuaded that the defendant did secure from the plaintiff certain insurance settlement monies that she received and used the same for his purposes and said proceeds no longer exist.
The court is also persuaded that the defendant secured funds from the oldest son Atila from funds belonging to that young man incident to the settlement of the injuries he sustained in the electrical accident.
The plaintiff also is apparently beset with modest hearing problems and while the plaintiff is able to speak English fairly coherently, her testimony was to the effect that she cannot read it.
It would appear that the plaintiff has very little in the way of formal education; particularly mindful of the age at which she was married.
The court is inclined to the view that the plaintiff did try and provide reasonably good care to the defendant's mother while that lady was here in Connecticut or in Texas.
The necessity of the two adult sons testifying in the proceedings, one for the plaintiff and the other for the defendant, was particularly distressing.
Mindful of the benefits being made available to the plaintiff by the State of Connecticut, whether the State intends to lodge any lien incident to those benefits on the real estate is at the present time unknown.
As of November 2000 the State had financially assisted the plaintiff to the amount of $8,129.00 and the assistance is on an ongoing basis so that at the present time the amount of the benefits and assistance is in excess thereof, plus the food stamps.
If it were not for the assistance by the State of Connecticut, and the supplemental assistance provided by the oldest son Atila Ali to the CT Page 2168 plaintiff, her circumstances would in fact be extremely difficult.
While the state of the tax or land records is not presently known to the court with regard to the real estate, it would appear that the oldest son Atila Ali has assisted to the extent of presumably paying the real estate taxes and other charges incidental to keeping the home from being liened by outside interest.
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes (C.G.S.) § 46b-82 regarding alimony and § 46b-62 regarding attorney's fees.
The court has considered all of the applicable case law that governs the matter.
The court has considered the testimony of the parties, their candor or lack thereof, and all exhibits and the arguments of counsel.
In considering the issue of alimony, particularly in this proceeding, the court has considered the interest of the State of Connecticut and the request by the State of Connecticut, the causes or factors leading to the dissolution of the marriage, the age, health, station, occupation, employability and prospects incident thereto, the estate and needs of the parties.
The court has considered the respective financial positions of the plaintiff and the defendant, their prospects for future income and opportunities, if any.
The court has considered the issue of fault.
The court has considered all of the evidence and the credibility and weight that should be given thereto.
The testimony of the parties and the financial affidavits reflect that there are no pension rights with which the court need concern itself in this proceeding.
As concerns the valuation of the real estate, the court considers the financial affidavit of the plaintiff more creditworthy than that of the defendant or his testimony with regard to value. CT Page 2169
The Court enters the following orders.
There is no necessity for any order as to custody, visitation or support; both of the children issue of this relationship being now mature adults.
The defendant shall cooperate with the plaintiff in assisting the plaintiff in securing coverage for health and dental insurance to the extent that the same is available incident to his employment at Foxwoods and the defendant is to continue said coverage for the period allowed, three years, at his cost and expense.
The plaintiff may keep and retain the contents of the home and residence; particularly mindful of the fact that the same have been provided with the help and assistance of the oldest son Atila Ali.
The issue as to tax exemptions is not applicable.
Each party is to pay their own attorney's fees.
As concerns the real estate known as 26 Lincoln Avenue in Pawcatuck, the defendant shall execute a good and sufficient quit claim deed conveying and setting over his interest in and to said real estate to the plaintiff and at the time of the execution of said deed of conveyance the plaintiff shall execute a non-interest bearing mortgage deed and note in favor of the defendant in the face amount of $22,500.00 to be paid on the death of the plaintiff, her remarriage, the sale of the 26 Lincoln Avenue property or her vacating said property with the intention of not returning, whichever event shall first occur.
The court enters this order mindful of the manner in which the premises were originally acquired and the subsequent improvements made to the property through the efforts of the defendant.
The defendant may retain the 1991 Ford and the 1996 Neon motor vehicles and be responsible for any debt incident thereto.
In accordance with and mindful of the request as set forth in the letters submitted to the court by the Office of the Attorney General, Welfare, the court awards alimony to the plaintiff in the amount of $1.00 a year. The same may be modifiable by either the State of Connecticut or the plaintiff. If modification is sought by the plaintiff, the State of Connecticut is to be notified.
The court grants the relief prayed for and dissolves the marriage on CT Page 2170 the grounds of irretrievable breakdown and declares the parties to be single and unmarried pursuant to the provisions of the statute.
Austin, JTR